|  |  |
|---|---|
| OBEDIAH WALKER III, As Executor of the Estate of Obediah Walker, Jr.<br><br>                 Plaintiff,<br><br>   v.<br><br>VIAD CORP,<br><br>                Defendant. | MDL 875<br><br>CIVIL ACTION NO. 16-215 |

## OPINION

**Slomsky, J.**                                                   **February 14, 2019**

## I.    INTRODUCTION

On November 25, 2015, Plaintiff Obediah Walker III ("Plaintiff") filed this action in state court, claiming that his father, Obediah Walker, Jr. ("Decedent"), developed lung cancer after being exposed to asbestos-containing products while serving in the United States Navy.[1] (Doc. No. 1 at 21.) Named as Defendants are several manufacturers,[2] including Defendant Viad Corp

---

[1] As discussed infra, this is the second of two lawsuits filed by Plaintiff Obediah Walker III regarding his father's alleged exposure to asbestos while serving in the United States Navy. The first suit was filed on February 5, 2014 in the Court of Common Pleas of Philadelphia County. See Walker v. Blackmer Pump Co., Civ. No. 0365 (Ct. Com. Pl. Philadelphia, filed Feb. 5, 2014). That case was removed to the United States District Court for the Eastern District of Pennsylvania on October 12, 2016. See Walker v. Blackmer Pump Co., Civ. No. 16-5349 (E.D. Pa. filed Oct. 12, 2016). On February 3, 2017, United States Magistrate Judge Thomas J. Reuter ordered that the two cases be consolidated under Civ. No. 16-215 pursuant to Federal Rule of Civil Procedure 42 because both cases involve the same plaintiff and the same decedent, and share common questions of law and fact. (Doc. No. 26.)

[2] Named as Defendants were (1) Amtrol, Inc., as successor in interest to Thrush Pump; (2) Certainteed Corporation; (3) Flowserve US Inc., as successor in interest to Sier Bath Gear and Pulp, and Aldrich Pumps; (4) General Dynamics Electric Boat, as successor in interest to Electro-Dynamic; (5) Hopeman Brothers Inc.; (6) Unisys Corp., as successor in interest to Sperry Corp; and (7) Viad Corp, as successor in interest to Griscom Russell Co. (Doc. No. 1.) Only Viad Corp is still defending the claims made here.

("Defendant"), who is alleged to be a successor in interest to Griscom Russell Company, a now defunct company that manufactured and sold equipment to the Navy from the 1940s to the early 1960s.  (Id. at 17.)

On January 15, 2016, Defendant Viad Corp removed this case from the Court of Common Pleas of Philadelphia County to the United States District Court for the Eastern District of Pennsylvania as part of MDL-875.[3]  (Doc. No. 1.)

On July 31, 2017, Defendant filed the present Motion for Summary Judgment.  (Doc. No. 31.)  Then, on August 31, 2017, Plaintiff filed a Response in Opposition to Defendant's Motion (Doc. No. 36), to which Defendant filed a Reply on September 14, 2017 (Doc. No. 37).  On February 28, 2018, the Court held a hearing on Defendant's Motion for Summary Judgment.  (Doc. No. 49.)  Finally, on March 6, 2018, Plaintiff filed a Supplemental Response in Opposition to Defendant's Reply Brief, in accordance with the instruction of the Court at the February 28, 2018 hearing.  (Doc. No. 54.)

Defendant's Motion for Summary Judgment (Doc. No. 31) is now ripe for disposition.[4] For reasons discussed infra, Defendant's Motion for Summary Judgment (Doc. No. 31) will be denied.

---

[3]  Multidistrict litigation is litigation comprised of multiple civil cases involving one or more common questions of fact, but the cases are pending in different districts.  Such actions may be transferred to any single district for coordinated or consolidated pre-trial proceedings.  28 U.S.C § 1407.  Which district to send cases to falls to the discretion of the United States Judicial Panel on Multidistrict Litigation, as authorized by 28 U.S.C. § 1407.  In 1991, the Judicial Panel on Multidistrict Litigation transferred all cases involving personal injury damages caused by asbestos products to the Eastern District of Pennsylvania in what is now known as MDL-875. See In re Asbestos Products Liability Litigation (No. VI), 771 F. Supp. 415 (J.P.M.L. 1991).

[4]  At this point in the proceedings, this is the only open motion for summary judgment in Civ. No. 16-215.  There are three open motions for summary judgment in Civ. No. 16-5349, which the Court will resolve in another Opinion and Order issued this day.

## II.    BACKGROUND

### A.  Decedent's Alleged Exposure to Asbestos-Containing Products

In 1969, Decedent Obediah Walker Jr. enlisted in the United States Navy, and from 1969 until 1971, served on active duty as an electrician aboard the U.S.S. Plymouth Rock.  (Doc. No. 36-2 ¶ 8.)  Plaintiff claims that Decedent's work aboard the U.S.S. Plymouth Rock exposed him to asbestos.[5]  (Doc. No. 1.)

James Owens was one of Decedent's supervisors on the U.S.S. Plymouth Rock.  (Doc. No. 36-5 at 18:23-19:2.)  According to Mr. Owens, electricians like Decedent maintained the electrical systems on the U.S.S. Plymouth Rock, and as a result, worked on every part of the ship.  (Id. at 19:21-20:9.)  In particular, Mr. Owens testified that electricians like Decedent frequently worked in the ship's engine room.  (Id. at 23:5-25:5.)  Also working in the engine room were tradesmen whose job it was to repair gauges, pipes, boilers, turbines, and other machinery essential to the proper functioning of the ship.  (Id.)  Because the United States Navy required ships to insulate all surfaces that reached or exceeded 125 degrees Fahrenheit, much of the machinery in the engine room was covered with insulation that needed to be stripped off before it could be repaired.  (Doc. No. 37-1.)  Mr. Owens did not know it at the time, but he testified that he later learned that this insulation contained asbestos.  (Doc. No. 36-5 at 25:6-26:2.)  In his deposition, Mr. Owens acknowledged that working in the engine room was dangerous because electricians like Decedent were likely exposed to asbestos fibers when insulation was stripped from machinery.  (Id. at 32:18-33:4.)

---

[5]   Asbestos is a naturally occurring, fibrous mineral found in the earth.  Known as a versatile "miracle substance," asbestos has been used as insulation; in building materials such as shingles and tiles; as friction products in automobiles; and in various other heat-resistant materials.  Hon. Eduardo C. Robreno, The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm? 23 WIDENER L.J. 97, 101 (2013).

Mr. Owens also testified that the electricians aboard the U.S.S. Plymouth Rock worked on or near the ship's distillation plant. (Id. at 34:13-19.) A distillation plant, also known as a distiller or an evaporator, is a piece of equipment that converts salt water into fresh water for consumption. (Id. at 34:10-12.) While electricians like Decedent did not work directly on the distillation plant, they frequently worked on the pumps that brought cold water to the distillation plant. (Id. at 34:13-19.) According to Mr. Owens, the distillation plant and pumps were covered with asbestos-containing insulation that needed to be stripped off to complete necessary repairs and electrical work. (Id. at 34:20-35:2.) Although the electricians did not personally strip insulation from the distillation plant and supporting pumps, they stood watch in the distillation plant room while the insulation was removed. Mr. Owens describes the distillation plant room as a "confined space." (Id. at 35:11-12.) He does not recall whether any of this machinery contained asbestos warning labels. (Id. at 70:25-71:3.)

**B. Decedent's Death from Lung Cancer**

In December 2013, Decedent, who smoked for the majority of his life, was diagnosed with mesothelioma.[6] (Doc. No. 36-2.) He passed away less than four months later, on March 17, 2014. (Doc. No. 35-4.) After his death, post-mortem pathology testing showed that Decedent did not suffer from mesothelioma; rather, he died from invasive non-small cell carcinoma, a type of lung cancer. (See Doc. No. 36-3.)

For the purposes of this litigation, Plaintiff commissioned an expert to evaluate whether Decedent was exposed to asbestos while aboard the U.S.S. Plymouth Rock. The expert was

---

[6] Mesothelioma is a form of cancer that affects the lining of the chest cavity or the peritoneum. Most types of mesothelioma are thought to be related to asbestos exposure. Mesothelioma, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/mesothelioma/symptoms-causes/syc-20375022 (last visited: Jan. 15, 2019).

Kenneth S. Garza,[7] CIH, MS, a Certified Industrial Hygienist, with over thirteen years of experience conducting inspections of asbestos-containing products. (Doc. No. 36-7 at 51.) After reviewing Decedent's history, documents provided by Plaintiff, and relevant asbestos-related scientific literature, Mr. Garza provided the following opinions in a report he authored:

A. According to the Sections above, based on industrial hygiene, scientific, regulatory, and other documents, these products were asbestos-containing.

B. When these asbestos-containing products were installed, removed, cut, manipulated, repaired, or in any way disturbed, workers and bystanders were exposed to significant airborne concentrations of asbestos. Significant contamination of clothing in asbestos occurs during the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product.

C. Significant exposure to asbestos is due to the installation, removal, cutting, manipulation, repairing, or in any way disturbing of an asbestos-containing product in such a manner that airborne asbestos-fiber concentration is released above background concentration . . . .

D. When the asbestos products were installed, removed, cut, manipulated, repaired, or in any way disturbed, Mr. Walker, while working with such products or as a bystander, was exposed to significant airborne concentrations of asbestos for each type of product.

E. Airborne asbestos does not settle quickly from the air and can easily become re-entrained[8] after it does settle.

F. Since the 1930s, working with or around hazardous contaminants in the work place, the need for engineering control, appropriate training, or appropriate respiratory protection was recommended. Asbestos was included among these

---

[7] Mr. Garza earned his Bachelor of Science degree in Biology, with a minor in Chemistry from St. Mary's University in San Antonio, Texas in 2001. He earned his Master of Science degree in Environmental Science and Management at the University of Texas in 2006. He is a Certified Industrial Hygienist, a Texas Licensed Asbestos Consultant, and a Texas Licensed Mold Assessment Consultant. (Doc. No. 23-10 at 51.)

[8] Re-entrainment is the phenomenon whereby dust is collected from the air stream and is then returned to the air stream, where it remains. Re-entrainment. DICTIONARY.UNIVERSITY http://dictionary.university/RE-ENTRAINMENT (last visited: February 5, 2019).

workplace hazards.  Good industrial hygiene practices would have included warnings.

G. I found no evidence of engineering controls, appropriate training, adequate warnings, or appropriate respiratory protection.  The concepts of engineering control, appropriate training, and appropriate respiratory protective equipment, working in concert, will reduce exposure to airborne asbestos.

H. The dangers of exposure to asbestos-containing products have been well documented in the scientific literature.  By the 1930s, asbestosis had been thoroughly documented in the industrial hygiene literature (Merewether, 1930). In 1955, the link between asbestos exposure and lung cancer had been firmly established in public health and industrial safety literature (Doll, 1955).  In 1965, the link between asbestos exposure and mesothelioma had been firmly established in public health and industrial safety literature (Newhouse, 1965).

I. My opinions may be supplemented or changed if new evidence/information is presented to me.  I declare under penalty of perjury that the foregoing is true and correct.

(Id. at 32-33.)

Additionally, after Decedent's death, Jerrold L. Abraham, M.D., Professor of Pathology and Director of Environmental and Occupational Pathology at Upstate Medical University, reviewed Decedent's records and history for the purposes of this litigation.  (Doc. No. 36-9.)  He concluded the following:

Asbestos exposure is well known to increase the risk of development of lung cancer, acting synergistically with cigarette smoking.  It is not necessary for there to be a diagnosis of asbestosis for asbestos exposure to cause lung cancer, since asbestosis and lung cancer are two separate adverse outcomes from asbestos exposure.  Mr. Walker had a history of asbestos exposure and smoking and developed a primary lung cancer.  Based on this information I can conclude to a reasonable degree of medical certainty that Mr. Walker's asbestos exposure was, along with his smoking, a substantial contributing causal factor in the development of his lung cancer.

(Doc. No. 36-9 at 2.)  In short, Dr. Abraham concluded that Decedent's lung cancer was caused in part by his exposure to asbestos.  (Id.)

**C. Defendant Viad Corp, the Alleged Successor in Interest to Griscom Russell Company**

Plaintiff claims that the distillation plant aboard the U.S.S. Plymouth Rock was manufactured by Griscom Russell Company and that Decedent was exposed to asbestos when workers stripped insulation from the distillation plant and its supporting equipment. (Doc. Nos. 1, 36.) In support of this claim, Plaintiff points to the Synopsis of Machinery and Hull Data for the U.S.S. Fort Snelling, a naval ship in the same class as the U.S.S. Plymouth Rock. (Doc. No. 36-6; Doc. No. 57 at 23:4-19.)

The cover page of the Synopsis states that the document summarizes the machinery aboard the "U.S.S. LSD 29," which Plaintiff concedes is the U.S.S. Fort Snelling, and not the U.S.S. Plymouth Rock.[9] (Doc. No. 36-6 at 1; Doc. No. 57 at 23:4-19.) However, the Synopsis also notes that the document summarizes machinery aboard every ship that falls within the "U.S.S. LSD 28" class of Navy vessels, which includes the U.S.S. LSD 28, the U.S.S. LSD 29, the U.S.S. LSD 30, and the U.S.S. LSD 31. (See Doc. No. 36-6 at 1-18.) At the hearing on February 28, 2018, Plaintiff represented that the U.S.S. LSD 30 is the U.S.S. Plymouth Rock. (Doc. No. 57 at 23:4-19.) Significant here, the second to last page of the Synopsis states that the distillation plant aboard ships within the U.S.S. LSD Class 28 class, including the U.S.S. LSD 30, were manufactured by Griscom Russell Company. (Doc. No. 36-6 at 17.)

Griscom Russell Company, which is now defunct, was a subsidiary of Hamilton-Thomas, a Delaware corporation. (Doc. No. 37 at 21.) From the 1940s to the early 1960s, Griscom Russell manufactured distillation plants used for the desalinization of seawater aboard Navy vessels. (Id. at 16.) While these distillation plants were not dangerous or defective when sold, Navy safety

_____

[9] "LSD" refers to "landing ship dock." (Doc. No. 1-1 at 32:14-20.)

regulations required a shipyard to cover the distillation plants with asbestos-containing insulation. (Id.)

On January 30, 1962, Baldwin-Lima-Hamilton ("BLH-PA"), a Pennsylvania Corporation, purchased 93.4% of Hamilton-Thomas' stock in a cash deal. (Doc. No. 37 at 21.) In April of 1962, Griscom Russell's shareholders voted to dissolve the corporation. (Id. at 26.) During a three-day auction in October of 1962, Griscom Russell sold its plant and all of its manufacturing equipment to more than five-hundred manufacturers, including competitors. (Id. at 28.) On December 18, 1963, Griscom Russell formally dissolved. (Id. at 23.)

In 1965, Armour and Company ("Armour"), a Delaware corporation, merged with BLH-PA, the entity that had purchased a majority share of Griscom Russell's parent company. (Doc. No. 38-3 at 4.) As part of this merger, Armour absorbed BLH-PA and BLH-PA ceased to exist. At that point, Armour transferred BLH-PA's liabilities to a newly formed Delaware subsidiary, Baldwin-Lima Hamilton ("BLH-DE"). (Doc. No. 37 at 37.) In 1972, BLH-DE changed its name to BLH, Inc., and on November 30, 1975, BLH, Inc. formally dissolved. (Id. at 56-62.)

In this action, Plaintiff sued Defendant Viad Corp, as successor in interest to Griscom Russell Company. (Doc. No. 1.) It is unclear how or when Defendant Viad Corp became involved with Armour, but Defendant does not dispute that it is Armour's corporate successor. It does, however, contest its designation as the corporate successor of Griscom Russell. (Doc. No. 1 at 7; Doc No. 37 at 3 n.14.)

### D. Procedural History

Plaintiff filed two state court actions related to Decedent's alleged exposure to asbestos-containing products while serving in the United States Navy. First, as noted previously, on February 5, 2014, Plaintiff sued fifteen manufacturers in the Court of Common Pleas of

Philadelphia County, alleging that their products, or the products made by their corporate predecessors, exposed Decedent to asbestos. See Walker v. Blackmer Pump Co., Civ. No. 0365 (Ct. Com. Pl. Philadelphia, filed Feb. 5, 2014).

Six days after Plaintiff filed the first state court action, Decedent testified at a videotaped deposition at the Philadelphia Veterans Affairs Medical Center, where he was living in hospice at the time. (Doc. No. 36-1.) At the deposition, counsel for only one defendant sued in the first lawsuit had the opportunity to question Decedent. At points during that questioning, Decedent did not know where he was and did not know what year it was. (Doc. No. 36-8.) No other defendant sued in the first suit had the opportunity to cross-examine Decedent. As noted above, on March 17, 2014 Decedent passed away. (Doc. No. 36-4.) He never submitted to a subsequent deposition. On October 12, 2016, the first state court action was removed to the United States District Court for the Eastern District of Pennsylvania. See Walker v. Blackmer Pump Co., Civ. No. 16-5349 (E.D. Pa. filed Oct. 12, 2016).

On November 15, 2015, Plaintiff filed the second state court action, this time suing seven new Defendants: (1) Amtrol, Inc., as successor in interest to Thrush Pump; (2) Certainteed Corporation; (3) Flowserve US Inc., as successor in interest to Sier Bath Gear and Pulp, and Aldrich Pumps; (4) General Dynamics Electric Boat, as successor in interest to Electro-Dynamic; (5) Hopeman Brothers Inc.; (6) Unisys Corp., as successor in interest to Sperry Corp; and (7) Viad Corp, as successor in interest to Griscom Russell Co. ("Defendants"). See Walker v. Amtrol, Inc., Civ. No. 3723 (Ct. Com. Pl. Philadelphia, filed Nov. 25, 2015).

On January 15, 2016, Defendant Viad Corp removed the second case from the Court of Common Pleas of Philadelphia County to the United States District Court for the Eastern District of Pennsylvania as part of MDL-875. (Doc. No. 1.) In the Notice of Removal, Defendant Viad

Corp claimed that it "has been erroneously sued as the alleged successor-in-interest to Griscom Russell" and disputed "that it is, in fact or at law, the successor-in-interest to Griscom-Russell." (Id. at 7.)  Because Decedent had already passed away when Plaintiff filed the second lawsuit, counsel for defendants sued in the second action, including Defendant Viad Corp, never had the opportunity to take Decedent's deposition and cross-examine him.

## III.    STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Favata v. Seidel, 511 Fed. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)).  A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For a fact to be considered "material," it "must have the potential to alter the outcome of the case."  Favata, 511 Fed. App'x at 158.  Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181

(3d Cir. 2009)).  The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried.  Anderson, 477 U.S. at 247–249.  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party.  Id. at 255.  If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party.  Id. at 250.

## IV.   ANALYSIS

In its Motion for Summary Judgment, Defendant first argues that the Court cannot consider Decedent's testimony because the deposition is inadmissible hearsay.  Additionally, it contends that Plaintiff has offered no evidence that any asbestos associated with a Griscom Russell Company product caused Decedent's lung cancer.  (Doc. No. 31 at 10.)  Finally, in its Reply to Plaintiff's Response in Opposition to the Motion for Summary Judgment, Defendant denies that it is Griscom Russell Company's successor in interest and thus claims that it is not responsible for any injuries that may have been caused by the asbestos-containing insulation that covered a Griscom Russell distillation plant aboard the U.S.S. Plymouth Rock.  (Doc. No. 37.)  As a result, Defendant submits that Plaintiff's claim against it fails as a matter of law.

Plaintiff contests Defendant's arguments.  First, he claims that Decedent's deposition testimony is admissible because it falls within the former testimony hearsay exception.  (Doc. No. 36 at 7-9.)  Second, he argues that the evidence in the record raises genuine issues of material fact as to whether Decedent's alleged exposure to Griscom Russell products were a substantial factor in causing Decedent's lung cancer.  (Id. at 9.)  Finally, while Plaintiff does not attack the merits of Defendant's successor in interest argument, he urges the Court to ignore the argument because it

is untimely and unfairly prejudices his case.  (Doc. No. 54.)  Consequently, Plaintiff urges the Court to deny Defendant's Motion for Summary Judgment.

The Court will first address whether Decedent's deposition testimony is inadmissible hearsay.  Thereafter, the Court will determine whether Plaintiff has identified evidence from which a reasonable jury could conclude that a Griscom Russell product was a substantial factor in causing Decedent's lung cancer.  Finally, the Court will examine Defendant's successor in interest argument and evaluate whether this argument is procedurally barred.

**A.  The Court will not Consider Decedent's Deposition Testimony Because it is Inadmissible Hearsay**

It is well established that "[h]earsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment."  See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009).  Defendant argues that Decedent's deposition testimony is inadmissible hearsay, and as a result, the Court should not consider it at this stage of the proceedings because it cannot be admitted at trial.  (Doc. No. 31.)  Plaintiff disagrees.  He contends that the deposition is admissible because it falls within the former testimony exception to the hearsay rule.  (Doc. No. 36.)  For the reasons discussed below, the Court is persuaded by Defendant's argument.

Federal Rule of Civil Procedure 32 governs the use of depositions at trial.  At trial, a party may introduce the deposition of a witness who has died so long as the deposition is admissible under the Federal Rules of Evidence.  Fed. R. Civ. P. 32(a)(1)(B).  A declarant's out-of-court statement offered for its truth is generally inadmissible hearsay because such a statement lacks the reliability of testimony personally proffered at trial, under oath, and subject to cross-examination. See Fed. R. Evid. 802; see also Plastipak Packaging, Inc. v. DePasquale, 75 Fed. App'x 86, 91 (3d Cir. 2003).  But exceptions to the hearsay rule exist.  Relevant here, Federal Rule of Evidence 804(b) provides that testimony that was given at a deposition and is "now offered against a party

who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination" is admissible so long as the declarant is "unavailable as a witness." A declarant who is dead is considered unavailable for the purposes of Rule 804. Fed. R. Evid. 804(a)(4.)

In this case, the parties contest whether Defendant Viad Corp had an opportunity to cross-examine Decedent. As noted above, Plaintiff filed two state court lawsuits relating to Decedent's alleged exposure to asbestos-containing products while serving in the United States Navy. The first lawsuit was filed on February 5, 2014 in the Court of Common Pleas of Philadelphia County. See Walker v. Blackmer Pump Co., Civ. No. 0365 (Ct. Com. Pl. Philadelphia, filed Feb. 5, 2014). Named as Defendants in that suit were Blackmer Pump Co., Buffalo Pumps, Inc., Carrier Corporation, CBS Corp., Copes-Vulcan, Inc., Foster Wheeler Corporation, General Electric Company, IMO Industries, Inc., Ingersoll-Rand Company, Patterson Pump Co., Tyco International, Inc., Tyco Valves & Controls, Inc., Union Carbide Corporation, and Warren Pumps. Id. Significantly, Defendant Viad Corp was not sued in the first state court action.

On February 11, 2014, six days after Plaintiff filed the first lawsuit, Decedent testified at a videotaped deposition taken at the Philadelphia Veterans Affairs Medical Center, where he was living at the time. (Doc. Nos. 36-1, 36-8.) Present at the deposition were counsel for Plaintiff, counsel for the defendants sued in the first state court action, and two of Decedent's sons. (Id.) Counsel for Defendant Viad Corp was not in attendance because it had not been sued at that time.

The deposition lasted from 10:16 a.m. until 1:41 p.m. (Doc. Nos. 36-1, 36-8.) During that time, Decedent was questioned by Plaintiff's counsel and counsel for Union Carbide Corporation. (Id.) When Decedent left the deposition room at 1:41 p.m., counsel for the parties in that case discussed whether counsel for the defendants sued in the first lawsuit could commence cross-

examination. (Doc. No. 36-8 at 2-6.) Plaintiff's counsel told opposing counsel that due to Decedent's worsening condition, there would be no subsequent deposition. (Id.) All questioning had to be completed that day. Plaintiff's counsel represented that Decedent could sit for cross-examination, but in the same breath, he expressed his hope that opposing counsel would not subject Decedent to questioning due to his increasing fatigue. (Id.) Counsel for the defendants sued in the first action refrained from cross-examining Decedent at that point. (Id.)

As noted above, Decedent succumbed to lung cancer on March 17, 2014—less than two months after the deposition. (Doc. No. 36-4.) No subsequent deposition took place. On November 25, 2015, almost two years after Decedent's deposition and death, Plaintiff filed a second state court action in which he sued seven parties, including Defendant Viad Corp. See Walker v. Amtrol, Inc., Civ. No. 3723 (Ct. Com. Pl. Philadelphia, filed Nov. 25, 2015).

In its Motion for Summary Judgment, Defendant urges the Court to forgo considering Decedent's deposition testimony because it is inadmissible hearsay. (Doc. No. 31.) In response, Plaintiff argues that the testimony falls under the former testimony exception because Defendant had the opportunity to cross-examine Decedent, "but made the decision not to." (Doc. No. 36 at 8.) But this is incorrect. Defendant Viad Corp did not have an opportunity to cross-examine Decedent because Defendant Viad Corp did not have an opportunity to attend the deposition. At the hearing on the Motion for Summary Judgment held on February 28, 2018, counsel for Defendant Viad Corp stated the following:

| | |
|---|---|
| Viad Corp Counsel: | . . . We were not there. Viad was not present for any of his deposition . . . . That's why we don't think it should be used against us. |
| The Court: | You were invited though, right? |
| Viad Corp Counsel: | I don't believe we were. |

| | |
|---|---|
| The Court: | Well, what does the record show? |
| Viad Corp Counsel: | The record shows that we were not there, Judge, and I have no evidence that we were noticed of the deposition. |

(Doc. No. 57 at 18:8-20.)  Quite plainly, Defendant Viad Corp was not invited to attend the deposition because Defendant Viad Corp had not been sued as of February 11, 2014, the day the deposition took place.  Thus, Defendant Viad Corp did not have an opportunity to cross-examine Decedent and the deposition testimony cannot be used against it.

### B. A Reasonable Jury Could Conclude that Griscom Russell Company Products Were a Substantial Factor in Causing Decedent's Lung Cancer

Next, Defendant argues that Plaintiff has not identified any evidence from which a reasonable jury could conclude that a product manufactured by Griscom Russell Company was a substantial factor in causing Decedent's lung cancer and eventual death.  (Doc. No. 31.)  Further, Defendant contends that Griscom Russell is not responsible for Decedent's death because Griscom Russell distillation plants were "bare metal" when sold to the United States Navy—that is, the distillation plants were not wrapped in asbestos-containing insulation until they arrived on Navy ships.  Plaintiff disagrees.  He submits that even without Decedent's deposition testimony, he has identified genuine issues of material fact as to whether the actions of Griscom Russell Company were a substantial factor in causing Decedent's lung cancer and death.  (Doc. No. 36.)  For the reasons discussed infra, the Court is persuaded by Plaintiff's arguments.

### 1. The Court will Apply Maritime Law

Central to the disposition of Defendant's Motion is what law governs the case.  Defendant asks the Court to apply maritime law in resolving the pending motion (Doc. No. 31), while Plaintiff contends that Pennsylvania state law should govern (Doc. No. 36).  On this issue, the Court agrees with Defendant.

The United States Constitution gives federal courts the authority to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. Further, "Congress has embodied that power in a statute," Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 531 (1995), conferring district courts with original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1).

A party seeking to invoke maritime jurisdiction pursuant to Section 1333 in an asbestos-related claim must satisfy a locality test and a connection test. See Connor v. Alfa Laval, Inc., 799 F. Supp. 2d 455, 458-59 (E.D. Pa. 2011) ("Connor I"). First, "in the case of asbestos-related disease arising from work on or around ships . . . the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters." Id. at 466. A party can satisfy the locality test by demonstrating that the injured party's Navy service was performed at sea aboard Navy vessels. Id.

Second, to meet the connection test, the party urging the court to apply maritime law must show (1) the asbestos exposure alleged had a potentially disruptive impact on maritime commerce, and (2) the allegedly defective products bear a substantial relationship to traditional maritime activity. Id. As to the first prong of the connection test, the court in Connor I held that alleged asbestos exposure has a potentially disruptive impact on maritime commerce where that exposure affects a sailor whose job it is to maintain equipment integral to the functioning of the vessel on which he served. In that situation, exposure to a defective product could "potentially slow or frustrate the work being done on the vessel." Id. (quoting John Crane, Inc. v. Jones, 650 S.E.2d 851, 854 (Va. 2007)). Turning to the second prong, the court in Connor I found that an allegedly defective product has a substantial relationship to traditional maritime activity where the product

at issue is essential for the proper functioning of the vessel. In that case, the defendant's manufacturing of the allegedly defective product is "so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply to the suit at hand." Id. at 469.

Having set forth the locality test and the connection test, the court in Connor I concluded the following:

> . . . [T]he maritime jurisdiction test requires the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel. By contrast, maritime law does not govern when the asbestos claims asserted stem from predominantly land-based Navy work even if the allegedly defective product was produced for use on a vessel.

Id. at 458-59.

Here, Defendant first submits that maritime law applies because the locality test is satisfied. (Doc. No. 31 at 8.) The Court agrees. Plaintiff asserts that Decedent contracted lung cancer after being exposed to Defendant's asbestos-containing products while working as an electrician aboard the U.S.S. Plymouth Rock while he served in the Navy. Thus, it is clear that the alleged exposure to asbestos-containing products occurred on a vessel on navigable waters.

Second, Defendant asks the Court to apply maritime law because both prongs of the connection test are satisfied. Again, the Court agrees. As for the first prong, whether the alleged asbestos exposure has a potentially disruptive impact on maritime commerce, Decedent, an electrician, worked on equipment that was essential to the operation of the vessels on which he served. As for the second prong, whether the allegedly defective products bears a substantial relationship to traditional maritime activity, Griscom Russell Company manufactured distillation plants that were crucial to the functioning of Navy ships. Consequently, the allegedly defective

product is so closely related to activity traditionally regulated by maritime law that the need to apply maritime law to this case is manifest.

In sum, given that the alleged exposure to asbestos occurred on a vessel in navigable waters, and considering that that the allegedly defective product was produced for use on a vessel, the Court will apply maritime law.

**2. Plaintiff has Identified Genuine Issues of Material Fact as to Whether a Griscom Russell Company Distillation Plant was a Substantial Factor in Causing Decedent's Lung Cancer**

Defendant claims that Plaintiff's evidence is insufficient to establish that a product manufactured by Griscom Russell Company caused Decedent's lung cancer. (Doc. No. 31.) Conversely, Plaintiff submits that he has produced enough product identification and causation evidence to survive summary judgment. Even without Decedent's deposition, the Court agrees with Plaintiff.

To succeed on either a negligence theory or a strict liability theory under maritime law in an asbestos-related products liability case, a plaintiff must establish causation. Hendrick v. A.O. Smith Corp., No. 16-476, 2018 WL 2322077, at *3 (E.D. Pa. May 22, 2018) (citing Lindstrom v. A.C. Prod. Liab. Trust, 424 F.3d 488, 492 (6th Cir. 2005)). To establish causation, a plaintiff must show: "(1) that the plaintiff was exposed to the defendant's product and (2) that the product was a substantial factor in causing the plaintiff's injury." Id. (quoting Connor v. Alfa Laval, Inc., 842 F. Supp. 2d 791, 797 (E.D. Pa. 2012) ("Connor II")). Further, a plaintiff must show that the defendant manufactured or distributed the asbestos-containing product to which exposure is alleged. Abbay v. Armstrong Int'l., Inc., No. 10-83248, 2012 WL 975837, at *1 n.1 (E.D. Pa. Feb. 29, 2012).

A plaintiff can show that a defendant's allegedly defective product was a substantial factor in causing his injury through direct evidence or "circumstantial evidence that will support an

inference that there was exposure to the defendant's product for some length of time." Abbay 2012 WL 975837, at *1 n.1. It is not enough to show "minimal exposure" to defendant's product. Id. Instead, "the plaintiff must show 'substantial exposure' in order to allow a reasonable inference—based on more than conjecture—that the defendant's product was a substantial factor in causing the plaintiff's injury." Hendrick, 2018 WL 2322077, at *3 (citing Lindstrom, 424 F.3d at 492). "[T]he question of 'substantiality' is one of degree normally best left to the fact-finder." Abbay, 2012 WL 975837, at *1 n.1 (citing Redland Soccer Club, Inc. v. Dep't of Army of United States, 55 F.3d 827, 851 (3d Cir. 1995)).

Plaintiff has identified sufficient evidence from which a reasonable jury could conclude that Decedent was exposed to asbestos-containing insulation used in connection with a Griscom Russell Company distillation plant. First, there is evidence that a Griscom Russell Company distillation plant was aboard the U.S.S. Plymouth Rock, the ship on which Plaintiff worked as an electrician from 1969 to 1971. The Synopsis of Machinery and Hull Data for the U.S.S. Fort Snelling, which also summarizes machinery aboard the U.S.S. Plymouth Rock, states that the distillation plants aboard these ships were manufactured by Griscom Russell Company.

Second, the deposition of James Owens, Decedent's supervisor aboard the U.S.S. Plymouth Rock, shows that Decedent either worked near a Griscom Russell distillation plant or stood in the distillation plant room when other tradesmen worked on the Griscom Russell distillation plant. (See Doc. No. 36-5.) Mr. Owens also testified that the distillation plant was covered with asbestos-containing insulation:

> Plaintiff's Counsel: You'd also mentioned a distillation plant. What was that?
>
> Mr. Owens: Made our fresh water. We called them evaporators. It took salt water and turned it into fresh water.

| | |
|---|---|
| Plaintiff's Counsel: | Did an electrician do work on the distillation plant or evaporator? |
| Mr. Owens: | Just the supporting equipment if there were pumps that supplied, you know, water. The pumps were pumping the water, circulating the water, whatever. And we – we worked on those pumps. |
| Plaintiff's Counsel: | Was the distillation plant or evaporator covered in anything? |

***

| | |
|---|---|
| Mr. Owens: | It was covered in insulation. Anything that was in there that was carrying cold water was wrapped with insulation because if it didn't it would sweat and drip. |
| Plaintiff's Counsel: | About how far was that plant from where you'd sit watch? |
| Mr. Owens: | Twenty feet. It was directly behind the generators. Space is maximized—it—it didn't give you a lot of room. You had just enough walking room in between the pieces of equipment to get around. That's . . . |
| Plaintiff's Counsel: | So in general, was it confined space? |
| Mr. Owens: | Yes. |
| Plaintiff's Counsel: | Did any other trades do work on the distillation plant? |
| Mr. Owens: | Of course, machinist mates did. |
| Plaintiff's Counsel: | What type of work would they do on the distillation plant? |
| Mr. Owens: | There again, if we had to work on a pump, they disconnected it. Or, you know, removed the couplings, the insulation, whatever needed to be removed. |
| Plaintiff's Counsel: | And where would the electrician be standing during that process? |
| Mr. Owens: | Well, like I said before, we worked together, so we were right there in the same space, same location. |

(Id. at 34:8-36:1.

As evidenced by Mr. Owens' testimony, Decedent and other electricians aboard the U.S.S. Plymouth Rock either worked on pumps that supported the distillation plant or stood watch in the distillation plant room when tradesmen worked on the distillation plant. To repair the distillation plant, tradesmen needed to remove insulation from the parts. Mr. Owens did not know it at the time, but testified in his deposition that he now knows that the insulation contained asbestos. (Id. at 25:6-26:2.) Thus, Decedent and other workers in the confined room where the Griscom Russell distillation plant was located were likely exposed to asbestos.

Whether Decedent's exposure to asbestos was a substantial factor in causing his lung cancer is a question for a jury. From the evidence identified by Plaintiff, a reasonable jury could conclude that Decedent was exposed to asbestos from a product manufactured by Griscom Russell Company and that it was a substantial factor in the development of his lung cancer, such that he should survive summary judgment

### 3. A Reasonable Jury Could Conclude that Defendant is not Entitled to the Bare-Metal Defense

Next, Defendant asserts that the "bare-metal defense" protects it from liability. That is, Defendant contends that it is not liable for asbestos-related injuries because the distillation plant manufactured by Griscom Russell Company was "bare metal" and any asbestos materials needed for it to function properly were only added later. Defendant argues that even "[i]f the [distillation plants] were in fact Griscom Russell products, the evidence shows that they would have arrived at the shipyard as 'bare metal.'" (Doc. No. 37 at 8.)

In a matter of first impression, the Third Circuit Court of Appeals recently addressed the bare-metal defense in In re: Asbestos Products Liability Litigation (No. VI), 873 F.3d 232, 240 (3d Cir. Oct. 3, 2017), cert. granted, Air and Liquid Systems Corp. v. DeVries, 138 S.Ct. 1990 (2018). There, the plaintiffs alleged that their husbands had been exposed to asbestos while serving

the United States Navy, and as a result, contracted cancer and died.  Id. at 234. In the district court, the defendant manufacturers invoked the bare-metal defense in separate motions for summary judgment.  Id. at 235. Based on a bright-line application of the bare-metal defense, that a manufacturer of a bare-metal product is never liable for injuries caused by later-added asbestos-containing materials, the district court granted the manufacturers' motions and dismissed the plaintiffs' claims.  Id.

On appeal, the Third Circuit held that under federal maritime law, the bare-metal defense must be applied as a flexible standard, not a bright-line rule.  In so concluding, the Court articulated the following standard:

> [F]oreseeability is the touchstone of the bare-metal defense; a manufacturer of bare-metal product may be held liable for a plaintiff's injuries suffered from later-added asbestos-containing materials if the facts show the plaintiff's injuries were a reasonably foreseeable result of the manufacturer's failure to provide a reasonable and adequate warning; and although cases will necessarily be fact-specific, already-decided precedents show, for example, that a bare-metal manufacturer may be subject to liability if it reasonably could have known, at the time it placed its product into the stream of commerce, that:
>
> (1) asbestos is hazardous, and
>
> (2) its product will be used with an asbestos-containing part, because
>
> > (a) the product was originally equipped with an asbestos containing part that could reasonably be expected to be replaced over the product's lifetime,
> >
> > (b) the manufacturer specifically directed that the product be used with an asbestos-containing part, or
> >
> > (c) the product required an asbestos-containing part to function properly.

Id. at 240.

Here, Plaintiff has pointed to evidence from which a jury could conclude that Griscom Russell Company reasonably could have known at the time it sold distillation plants to the United States Navy that (1) asbestos was hazardous; and (2) the distillation plants would have been used

with an asbestos-containing part because it is likely that the distillation plants required asbestos-containing insulation to function properly.

First, a reasonable jury could conclude that Griscom Russell knew that asbestos was hazardous at the time it sold distillation plants to the United States Navy. According to the expert report of Mr. Kenneth Garza, "[t]he hazard of workplace dust, including asbestos, has been recognized since the 1930s . . . ." (Doc. No. 36-7 at 10.) The United States Navy was aware of the potential hazards of asbestos as early as 1922, and by the 1940s, "the Navy's knowledge regarding the potential hazards of asbestos was quite complete when compared the to the available knowledge at the time." (Doc. No. 1 at 10.) In 1951, the Walsh-Healy Act implemented regulations to control known workplace hazards, including asbestos dust. (Id. at 11.) By 1955, public health and industrial safety experts firmly established the link between asbestos exposure and lung cancer. (Id. at 12.) By 1965, experts affirmatively linked mesothelioma to exposure to asbestos-containing products. From this evidence, it is likely that a reasonable jury could find that Griscom Russell, a company that was in the business of providing products that required asbestos-containing insulation to the Navy, knew of the dangers of asbestos exposure when it sold distillation plants to the Navy from the 1940s to the early 1960s.

Second, a reasonable jury could conclude that Griscom Russell knew that it was likely that its distillation plant would require asbestos-containing insulation to function properly. Defendant acknowledges that the United States Navy required ships to insulate all surfaces that reached or exceeded 125 degrees Fahrenheit, but asserts that distillation plants manufactured by Griscom Russell did not need to be insulated. (Doc. No. 37 at 2.) Defendant does not cite to any evidence in the record to support this assertion. Instead, an expert report submitted by Defendant only states that "[t]he Griscom-Russell equipment manufactured for use on U.S. Navy vessels would have

been manufactured without insulation and shipped to the shipyards without insulation." (Doc. No. 1 at 33.) The report further notes that such "equipment would have been totally insulated at the shipyard, or after installation on the vessels, by others using insulation purchased from others." (Id.)

In his deposition, Mr. Owens testified that the distillation plant on the U.S.S. Plymouth Rock was covered with insulation. Further, he testified that the pumps that brought water to the distillation plant were covered with insulation. Mr. Owens stated that he did not know it at the time, but testified that he later discovered that the insulation contained asbestos. From this evidence, a reasonable jury could find that Griscom Russell—a company that routinely sold products to the United States Navy and was familiar with its codes and regulations—would have known that its products would have been covered with asbestos-containing insulation.

## C. The Court Need Not Address Defendant's Successor in Interest Argument

Finally, in its Reply to Plaintiff's Response in Opposition to the Motion for Summary Judgment, Defendant argues that Plaintiff's claim fails because it is not a successor in interest to Griscom Russell Company. (Doc. No. 37.) At the hearing held on February 28, 2018, Plaintiff urged the Court to reject this argument on procedural grounds—that is, Plaintiff argued that the argument was barred because it was raised for the first time by Defendant in the Reply brief. The Court afforded Plaintiff the opportunity to file a response to the Reply brief. In the Response, Plaintiff reiterated his procedural argument. (See Doc. No. 54.)

Defendant argues to the contrary that Plaintiff had notice of its successor in interest argument because it was noted in a single line in the Notice of Removal from state court as follows: "Viad has been erroneously sued as the alleged successor-in-interest to Griscom-Russell . . . ." (Doc. No. 1 at 7.) Defendant also included a footnote to this line, which reads as follows: "Viad

disputes that it is, in fact or at law, the successor-in-interest to Griscom-Russell." (Id. at 7 n.2.) This defense was never raised again in this litigation until it appeared in the Reply brief in support of Defendant's Motion for Summary Judgment.[10]   As a result, Plaintiff "had no reason to inquire about the successor-in-interest issue during discovery, obtain a rebutting expert opinion, or take the Rule 30(b)(6) deposition of a Viad representative."  (Id.)

On September 14, 2017, Defendant filed its Reply to Plaintiff's Response in Opposition to its Motion for Summary Judgment.  As noted, in that brief the corporate successor argument appeared.  With the Reply brief came hundreds of pages of documentary evidence, including tax returns, corporate papers, and affidavits that Defendant claims demonstrate that it is not a successor in interest to Griscom Russell Company.  This untimely disclosure violates Federal Rule of Civil Procedure 26, which requires a party to disclose all documentary evidence in its possession which may be "used to support its claims or defenses" within 30 days of being served with a complaint or joined as a defendant.  Fed. R. Civ. P. 26(a)(1)(D).  Defendant neither turned over these documents in accordance with Rule 26 nor provided them to Plaintiff during any period of discovery as required by the Court's Scheduling Order (Doc. No. 27).

To make matters worse, it appears that Defendant had these documents in its possession long before the start of this litigation.  In support of its successor in interest argument, Defendant cites to Payne v. Saberhagen Holdings, Inc., 190 P.3d 102, 113 (Court App. WA. Aug. 18, 2008), a 2008 case in which Defendant Viad Corp, using the same evidence cited here, successfully

---

[10]   Defendant Viad Corp did not file an Answer to the Complaint in state court in accordance with 231 Pa. Code Rule 1041.1.  Nor did it file an Answer to the Complaint pursuant to Federal Rule of Civil Procedure 81(c)(1)-(2), which applies to removed actions.  Plaintiff never made an issue of Defendant's failure to file an Answer and litigation continued to the summary judgment stage.  Thus, the successor in interest claim was not raised as a defense under Federal Rules of Civil Procedure 12 or 81(c)(2) either in an Answer to the Complaint, or in a motion.

argued that it was not a corporate successor to Griscom Russell Company. From <u>Payne</u>, it is evident that Defendant had these documents in its possession for at least eight years before the present lawsuit was filed, but withheld them until a time in this case that Plaintiff could be prejudiced. At that point, Defendant had already filed its Motion for Summary Judgment and discovery had already closed, so Plaintiff did not have the opportunity to investigate, engage in discovery, or properly challenge the claim being made.

To allow a party to subvert the proper course of litigation under the Federal Rules of Civil Procedure would be tantamount to permitting litigation by surprise. This untenable situation only prolongs litigation, increases its expense, and unnecessarily impinges on the resources of the Court.

Moreover, the law is clear that reply briefs should respond to arguments raised in the opposition brief, or explain a position in the initial brief that the respondent refuted. Reply briefs are not the proper vehicle to present a new argument. The reason for this is manifest: allowing a party to argue a matter for the first time in the reply prevents the non-moving party from demonstrating that the record does not support the moving party's factual assertions and from presenting an analysis of the new argument. <u>See</u> <u>Westawski v. Merck &Co., Inc.</u>, No. 14-3239, 2015 WL 463949, at *12 (E.D. Pa. Feb. 4, 2015). As the Third Circuit has explained:

> A summary judgment movant must provide the nonmoving party with notice and a reasonable opportunity to respond. <u>See generally</u>, Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments ... so long as the losing party was on notice that she had to come forward with all of her evidence."). There is cause for concern where a movant presents new arguments or evidence for the first time in a summary judgment reply brief, particularly if the District Court intends to rely upon that new information in granting summary judgment to the movant. <u>See, e.g.</u>, <u>Beaird v. Seagate Tech., Inc.</u>, 145 F.3d 1159, 1164 (10th Cir.1998) ("[W]hen a moving party advances in a reply new reasons and evidence in support of its motion for summary judgment, the nonmoving party should be granted an opportunity to respond."); <u>Provenz v. Miller</u>,

102 F.3d 1478, 1483 (9th Cir.1996) (a District Court should not consider new evidence raised in the reply to a motion for summary judgment without giving the nonmoving party an opportunity to respond); Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 410 (1st Cir.1985) ("[T]he nonmoving party ... should have had an opportunity to examine and reply to the moving party's papers before the court considered them in its decision process.").

Alston v. Forsyth, 379 Fed. App'x 126, 129 (3d Cir. 2010).

In this case, the Court will not burden Plaintiff at this point to investigate or seek additional discovery in opposition to Defendant's claim that it is not a successor in interest to Griscom Russell Company in view of the longstanding notice that Defendant had of this issue and the manner in which it raised the issue and dumped documents on Plaintiff with the Reply brief. Raising an issue in a single line with a footnote in a Notice of Removal and not raising it thereafter until a summary judgment reply brief is filed is not the proper way to bring a critical matter to the attention of an opposing party, or even the Court. It should not be countenanced.

For these reasons, the Court need not address Defendant's successor in interest argument at the summary judgment stage.[11]

## V.    CONCLUSION

For the foregoing reasons, the Court will deny Defendant Viad Corp's Motion for Summary Judgment (Doc. No. 31). An appropriate Order follows.

---

[11] If Defendant is going to pursue the successor in interest defense at trial, it should file a memorandum of law as to why the matter is not waived. If the Court finds that the matter is not waived, Plaintiff will be afforded the opportunity to pursue any discovery necessary on the issue of whether Viad Corp is a successor in interest to Griscom Russell Company.